I'm pleased to report that this must be Mr. Kaposi. Tony Kaposi from Fresno, California. How are you? Fine, thank you. May I please the court? Oh, you're here from Fresno. Yes. Very nice place, Fresno. It is very nice. I always have very pleasant visits there. I know. Please proceed. Thank you. As this court knows, this is a conspiracy to commit the securities mail and wire fraud and money laundering case. The entire defense in this case was the defendant's lack of intent to defraud and good faith belief that there was measurable quantities or measurable and economically viable quantities of precious metals and volcanic cinders. Now the government put on one expert, Dr. Prey, and testified that there was not any kind of measurable quantities of precious metals. And he admitted assays for the truth of the matter asserted that there wasn't any precious metals in these cinders. Yet the defense was not allowed to introduce evidence that established the defendant's good faith belief that there was precious metals in these volcanic cinders. The main issue in this case really doesn't come down as to whether or not there actually was precious metals, but as to only the good faith belief and what was in the mind of the appellant in this particular case. A co-conspirator was on the stand, Michael Gardner. He identified exhibit 509 and 510, which were assays. There were two exhibits and there were about two pages each that was allowed into evidence. He was shown the exhibits. He said, yes, I saw these, I looked at these, and I examined them and conversed with the defendant, now the appellant, in the case. They were admitted and the judge specifically told the jury, these are admitted not for the truth of the matter asserted. We don't know how truthful these are, but it only goes to show the state of mind of the defendant. After those two were put in, the defense then attempted to put in exhibits 501 and 512, which is, as you can see, a stack of assays that had been conducted just as the others had. The court saw how voluminous these exhibits were and said, wait a minute, I can't let this in. There's too much there. There's too much evidence there. Well, the government made the same objection that it's not allowed because there's no foundation laid. The defense made the same argument they did on the other two exhibits, that it's not for the truth of the matter, Your Honor, it's only to show the defendant's state of mind. And the problem is that without leaving aside any scientific validity, which it seems to me is not right, that there's not really a deliberate problem here, but in order to tell you anything, even about the defendant's state of mind, don't you have to know something about what, about the particular sample that was used for each of these assays and where it came from? If you don't know what was being assayed, it doesn't tell you anything about her state of mind. These assays did say what was assayed. It said where it came from. No, that's a good question. It didn't necessarily say it came directly from these areas that were being mined, but I don't think that's the issue. The issue here is what did these assays say? But she could have adulterated every one of them before she gave them to the assayer, or other people could have. She could have, but there was no evidence she did. But there was no evidence she didn't. That's why you need a foundation in order to know what these documents are. Each of those assays says, that was recited down at the bottom, that the assayer can't verify where the samples came from. On one of them, it did. Dr. Jordan said it was. I think that was on 512. But on 501, that's not the case. It was from Geochemical, which was the government's witness acknowledged it was a very credible assayist. The point is... Well, he was a credible assayist, but he was only assaying whatever he was given. And unless there's a foundation as to what he was given, I don't see that those documents themselves on their face have any significance at all. I think they have deep significance in terms of the defendant's state of mind. Your argument is correct in terms of the foundation. There's no question that the foundation wasn't laid as to where it came from, how it was done, et cetera. But that's not the point here. The point here is... But she was in a position to know that. And therefore, many of the samples were brought by her. I disagree with that. Well, I looked at them, and many of them said they were brought by her. Well, if you looked, I went through them with her last week over at Dublin. Some of them were. A significant number of them were. Some were submitted by her, yes. And others were brought by other people, but she was a principal in the company. She was. But that's the government's argument in this case. Everything in this case by the government is that it's a scheme. No matter what the appellant did in this scheme, in this scheme... But that's not the question. The question is what would the jury... What good would this have done to the jury in terms of understanding her state of mind without some evidence about the background of these samples? I don't think you need the background of the samples because whether or not these are true or false is not the significant aspect. That's irrelevant. What's relevant is what was in her mind. Mr. Gardner said he reviewed these. Indeed, his handwriting is on these. Her handwriting are on these. They reviewed these. And yet they weren't allowed to testify as to what they talked about with this and what was in her mind when she went through this. If she brings in false samples and then she gets a report out that says, oh yeah, these are very rich in these, then it doesn't change her mind about what the thing is. She knows that the report is going to say that because she salted the sample with these minerals. I can't disagree with you there, but that's not the case. So why isn't there a question on target that without a foundation to show that these were either provided by somebody else or that it was provided by her, she took it right from the ground, that it couldn't have any effect on her state of mind? Because to set that foundation that you would need that if it were put in for the truth of the matter asserted. This is an exception to the hearsay. Maybe you should go on to the question about the psychiatric test. Well, that clearly. Did your client testify? No, she did not. And nobody else testified about how these samples got to the assayists? I wasn't the trial attorney. I don't recall any testimony other than it came from Mr. Weinberger and some came from the appellant. Okay. Go ahead. Anyway, what I want to do is if I can make one quick argument on this is on the Moran case. I think in that case it's just a direct point with this one where the court didn't allow in the hearsay testimony that went to the state of mind. And another case that just came out also was the district court case. I know it's a district court case, but that's the Messer case where a medical report was allowed to come in, and the court there said that it's allowed in as an exception to the hearsay rule to go to the psychiatrist's testimony. I think that was very important in this particular case. It was brought in afterwards by not the trial counsel, another counsel had been brought in. And in there they indicated the problems with the appellant. She is from Taiwan. I got to know her quite well when I did the sentencing and now the appeal. Very difficult to understand her. Very difficult for her understanding the English language. And in their reports it pointed out the... Was there a translator present at the proceeding? I don't think there was. I know when I went in on the sentencing there was not, no. But you could have had a translator. Yes. Yes. So the problem really isn't translation, is it? I think it's her understanding of what was going on. Okay. But if the understanding is related to her ability to understand the English language, then the problem is not having a translator. That's not... I agree with you. That's not really something that you can come in and complain about at this point. I'm not doing that.  I didn't understand that to be the problem, the central problem of the psychiatrist's testimony. Psychiatrist's testimony went into and did some testing with her and how she understands and comprehends the English language. They talked about some problems she has in terms of comprehending and understanding certain matters. A lot of these were legal concepts she did not understand. She didn't understand them because... Of her background. Her background meaning that she's from Taiwan and doesn't speak English. She speaks English very, very not very well. Again, counsel, if the problem is she didn't understand the English language, that's not the district court's fault if nobody's asked for a translator. She understands the English language, Your Honor. We're not saying that. Okay. So the problem is when you say her background, you don't mean the fact that English isn't her first language. So what is it in her background other than that English isn't her first language that is the problem? Her understanding involved in this business, understanding what was really going on. Is it because she's retarded? She's not retarded. Okay. What does the IQ of 79 and borderline mean? I guess I don't understand what those terms are. Well, 70, I think, is considered retarded. Anything above goes up the ladder. But she's not retarded. I think it's her understanding and her background and her being brought up in Taiwan and following her husband, following others in getting things done, doing what her husband told her. Her husband had passed away. I don't think there's any question that came out through the trial. He was a con man. He had convinced her that what they were doing was fine. And she believed what was going on. Was any of the money recovered? I'm sorry? Was any of the money recovered? Money had been returned to some of the investors. Not all the money, no. No. What happened to the money? It was used. It was about $5.2 or $6 million raised. $4.8 million went into building a refinery and doing the mining of the ore and trying to bring out the precious metals. $4.8 million was spent just on doing that. And the other part was doing various expenses with the business. And the point is, if this was a fraud, why in the world would you spend $4.8 million building a refinery? And I think that was strong evidence that it wasn't a fraud. I still don't understand your theory as to what the problem is here. You're asking for a new trial. Yes. You're asking for a new trial on the basis that you have newly discovered evidence, which is that she is incapable of what? Of understanding the proceedings and nobody noticed this before? Her previous attorney taking her all the way through trial didn't notice that she was having trouble? I don't think the attorney who tried the case paid very much attention to her. Relatedly, was the point of the new trial request, it was a new trial request. It was not a request for a competency hearing. No, it wasn't. Right. So presumably it's because you would have put this evidence on at trial. You would have put the psychiatric, the new evidence, whoever was doing it, right? It's new evidence, meaning evidence that should have been put on at trial. Is that what you're saying? Yeah, I would have put it on. So it doesn't go to competency because if she's incompetent, she's incompetent. I'm not saying that. It must have had to go to some issue at the trial, presumably the intent issue. Yes, yes. So it's not a competency question. It's an intent question as to whether she was capable of forming the requisite intent. Yes. All right. I guess there are two issues that are raised. A, was this, in fact, newly discovered evidence with regard to due diligence? Submission, yes. And the second is, what was the district judge's reason for not letting it in? And was it an adequate reason? In looking at the transcript from the motion for new trial, and again, I wasn't part of that, but it was clear he just looked at the affidavits that came in and their reports of their examination of the appellant and just said, it's preposterous. I don't believe what they say here. I've read other cases. The government, in their response, opposition to the motion for new trial, submitted a number of cases with these experts that testified, and a judge went through those cases and adopted what the government had argued and said, their testimony in these other cases is preposterous. I'm just not going to believe them. They're not credible. Why did the defendant go look for someone not here in Las Vegas, where we have competent psychiatrists, and go to New York to bring people in from there? I just don't believe it. That doesn't sound like a very good reason. Was there any other reason? That's the reason, Your Honor. What about the due diligence question? In terms of not realizing that? That, I don't understand why the defense didn't. It's clear in my experience with this. I mean, it does seem awfully odd to say that, I mean, whatever her psychological situation. No one's claiming that she was mentally ill, right? No, she wasn't. No, she wasn't. So they're claiming simply that she was, you know, she was a naive and not very bright person. And here's the problem with her. She would agree with everything and just go along with everything, not knowing what anybody was talking about. Do you have any case which would demonstrate that that evidence would have been admissible at trial on the intent issue? I think her mental status would have been admissible at the trial and positive of that fact. I've done it many times in many other trials, showing the state of mind of the person. Any psychiatrist and psychologist ought to say this person's not very smart? I don't say it exactly that way, just to say what their mental capacity is and their understanding of certain issues. And it was pretty clear in the test that she took, she really didn't understand a lot of the things in the test that they were giving her. In dealing with her on the sentencing, I can vouch for the fact. But, counsel, there was also quite a bit of evidence here that she had pretty much met with this company. No question. She was made an officer of the company. She met with investors. She met with assayists outside the presence of her husband. True. She was running these operations. She had previously run other businesses. It appears that way. I wish you would have testified so the jury could see what kind of person she really was. She makes like she understands what is really happening and doesn't and has no clue and just wants to be a successful business person and did the things she thought she had to do to make a successful business. And I think that testimony, her being on a stand, her with a psychiatrist examining her background and explaining to the jury what she's really like. It sounds to me like what you really have here is an effective assistance. There's no question about that, Your Honor. And the question is, it wasn't an abuse of discretion not to order the new trial as opposed to filing a 2255, you know, tomorrow and dealing with it that way. I would never do that and skip an appeal. I would always do the appeal. Then do the 2255. But you need to tell us why this would be. I mean, given the fact that she, you know, presented whatever she presented and her lawyer should have been able to evaluate it, which is really what you're saying, and didn't, then we have a due diligence problem, at least on behalf of the lawyers. I understand that. But I think, I lost my train of thought because I had a good answer to what you were just saying. The motion for new trial, here's my issue. The judge may have denied it without really hearing any evidence. He should have listened to the psychiatrist. Let me put the defendant on the stand. Well, again, I wasn't there then. Let me put her on the stand on this motion for new trial. And when I went in for sentencing, I told the court, I would like to have the question and answer. Didn't you also essentially say you didn't believe the psychiatrist either? Pardon me? I would put. Didn't you also suggest that you didn't much believe the psychiatrist either? Only to the fact that she's retarded. She's not retarded. And I think the problem with the test that were given by the psychiatrist is that they were given in English. I think if they were given in her own native language, it would be a lot different. You have about two minutes left. Yeah, I know. I'd like to reserve that. Let me just make one other point, if I could. On the sentencing, I think the court should have had some kind of a hearing on this. If there's anything, there might be a little bit of sentencing entrapment here because everything was done at the end of 2001. In January of 2002, the government sends in two informants to talk to her and talks about possible further investments, et cetera. Nothing ever happened. Everything that took place happened by the end of 2001. And my argument is the guideline edition of 2000 should have been applied, not the 2001 edition, which would have substantially lessened her sentence. That would have made a big difference. Yes, a big difference. But with non-binding guidelines, it becomes a little hard to get too excited about. Well, it would have made a big difference at your starting point here. A major difference. And I'll get into that a little. OK. Thank you. May it please the court. My name is Timothy Vasquez. I'm an assistant U.S. attorney here in this district. I was also the trial attorney in this case. And in light of some of the court's questions to appellant counsel, what I'd like to do this morning is just spend a few minutes reviewing the history of this case and the overall scheme. So I think that has a bearing both on the issue he's identified with regard to the assays. And it also is significant in understanding the evidence or they claim newly discovered evidence of some sort of I'm not sure if the mental defect or exactly what they're claiming at this point in time. In any case, this scheme was replete with fraud from beginning to end and from top to bottom. This scheme began back in the early 1990s when Robert F. Flaherty, who's deceased, the appellant's prior husband, began selling or purchase agreements to investors. Under these oral purchase agreements, he claimed a remarkable ability to turn volcanic cinders into gold. Now, he wasn't the first person ever made such a representation or suggestion. It goes back to the Middle Ages. It goes back a long time. And you can go back to Flagstaff in the 1980s. And then in the 1990s, a fellow named Alvin Johnson was doing some research. Robert Flaherty became familiar with that research. He is, I believe, is beyond dispute right now, simply nothing but a con man. He took that research, packaged it up with his oral purchase agreements, and then went out and found investors persuading them. Cinders contain huge amounts of precious metals, a wonder ore, potpourri of metals, gold, platinum group metals, just remarkable ore. Then he also claimed that he owned huge reserves of cinders. Figures went as high as $25 billion as this conspiracy progressed. And then he claimed that he had developed, he had developed, with the assistance of various other people who he'd credit, the ability to extract the precious metals from the cinders. But then he up and died. He died many, many years later. So it's, you know, much, much as you'd like to. Long before he died, in 1992, the appellant married Robert Flaherty. There was testimony at trial from a fellow named Don Manzo who had taken Robert Flaherty literally into his house because he was broke. He was simply peddling these oral purchase agreements and living hand to fist. He meets Diana Flaherty, who at that point in time is working essentially as a mortgage broker or arranging loans through the Far East National Bank. And I'll come back to that in a moment. But he meets her, they get married, and Don Manzo's testimony was after they got married, Diana Flaherty insisted that she have managerial control of the corporation. Manzo's testimony, there were heated arguments, and both of them would consult with him. They'd sometimes argue in front of him. And eventually, Robert F. Flaherty capitulated, and he made Diana Flaherty an Austrian corporation. In fact, they named that prior corporation originally called Robert F. Flaherty Incorporated. They changed the name to Robert F. and Diana Lee Flaherty Incorporated. And I noticed that a number of the victims here, a number of the investors, appear to come out of the Chinese American community. Were those arranged by Diana Flaherty? Yes, they were, and that came later in the process. Were these people she'd been a loan broker for in her previous life? No, sir. Well, let me just quickly go through sort of the chronology, because the ore purchase agreements, there was some testimony that she participated in selling those ore purchase agreements, and it was beyond any dispute. In fact, there were ledgers in evidence that she was the one managing the funds. She kept a ledger. She'd make the payments to the agents who were selling the ore purchase agreements for them, and she'd also make payments for a variety of personal expenses out of the corporate funds, funds that had been earmarked for this purpose. Now, you go forward a few years, and ore purchase agreements have certain limitations. It's not very efficient. So in 1993, shortly after the appellant married Robert F. Flaherty, the two of them get the idea of going public. What they did was they did a reverse merger with a publicly traded corporate shell, and it was a remarkable reverse merger, because in exchange for controlling interest in this corporation that was later renamed Phoenix Metals, they represented that they were transferring Robert F. Flaherty's secret process, his technology as to how to extract cinders or gold from cinders. And they also promised to transfer $75 million worth of cinders into the corporation. This was just a corporate shell that had failed. There was testimony by Lee Payne at trial about that. The wrinkle here is by this point in time, by the psychiatric reports themselves, Diana Flaherty knew Robert Flaherty was nothing but a con man. He actually signed an affidavit supporting that reverse merger where he purported to transfer his proprietary processes. What's more, that ore, they didn't own it. There was a brief period of time through a variety of mechanizations that I won't get into right now, from November 1994 to about December 1995, where they had some sort of colorful tile to these cinders, but they were actually owned by Shorty Reedhead. And Robert Flaherty entered into several contracts with Reedhead. Reedhead was upside down to another bank. Robert F. Flaherty came in and said, I'm the world's richest man. I'm going to bail you out, and we're going to make a partnership, and we're going to do something with this. Nothing ever happened. He defaulted on every contract, which is why Shorty Reedhead had to refinance with Far East National Bank. Diana Flaherty knew that. She knew that Reedhead had refinanced the property. She knew Reedhead kept the property because she even got a finder's fee as part of that mortgage from Far East National Bank of about $20,000. Because that's what she was doing at the time. This woman who is supposed to be mentally incapable in some degree was working after she left her first husband, who she was married to her first husband in the Midwest, an Air Force officer. She had various businesses. She left him because in the psychiatric report, I think they say she considered him a wet blanket or something. He was suppressing her creative impulses. She left him and moved by herself to Los Angeles, where she starts doing this business of mortgaging, brokering and finding lenders and reviewing property for Far East National Bank. And that's how she met Robert Flaherty in 93. Now, then they do this reverse merger, where she's making representations in an affidavit that she knows are not true. It doesn't matter whether their IQ is 80 or 180. The fact is that she knew, and she said in various prior testimony that was introduced to the court at the time of these other motions, she testified that the land belonged to Shorty Reedhead and that they weren't actually producing any precious metals. And this was a critical part of this whole component. Once they had the corporation, Vanna Flaherty was an officer. Throughout the existence of Phoenix Metal, she was an officer. And the testimony from insiders was she was actively managing the corporation. She controlled it. She was the chief in this Flaherty Incorporated in Phoenix Metal. And you didn't want to cross her was the testimony. But in any case, one of the first things they do after they acquire the corporation, notwithstanding that they've already purportedly transferred $75 million of ore into the corporation, they start pumping it up with more ore. September 28, 1993, Minutes, signed by Vanna Flaherty, purport to transfer an additional 150,000 tons of ore into the corporation with a value of $150 million. January 25, 1994, Exhibit 46A, a trial. An additional 150,000 tons of ore were purportedly transferred. All of this goes to your, basically what you said in the briefs, which is that any lies connected to the content of the ore was only a part of it. Yes, sir. I'm sorry. Yes, Your Honor. And then, of course, the big one was almost $3 billion that they created. So they create this corporation, and then they proceed to sell the stock. With that, then, let me just move ahead, then. What do you think of the fact that most of the money was used to actually mine this ore? That's factually untrue. At trial, they call, I believe it was Mr. Olson, to testify as their financial analyst. On cross-examination, I demonstrated that what he was treating as business expenses included tuition for her daughter at Northwestern University and a variety of other matters. On cross-examination, it became clear that he simply took the data that was provided to him by defense counsel and shuffled through that very carelessly, including, and he contradicted himself on this point and was impeached on it, including various personal expenses as business expenses. What the record shows, and we've used a very conservative estimate because our financial analyst, even though this company wasn't making widgets, even though the Flaherty's had no legitimate income that we could identify, we didn't include all the income that went into their various corporate accounts. Rather, he only included income that could be linked to a stock transfer certificate. That is, you have a deposit for, say, $50,000. If that couldn't be linked to a stock transfer certificate, it wasn't included. If it could be linked, that is, if you have a check in the bank records, $50,000 from Joe Smith, and you find a stock transfer certificate in that approximate time frame to Joe Smith, then that was included. So it's a very conservative calculation, and we still came to the figure approaching $6 million. Now, what happened to the money? When this started, Diana Flaherty was working as a mortgage broker, living in an apartment in El Humber, California. Robert F. Flaherty was flat broke, living with Don Manzo. After they got married, Don Manzo testified that he had to pay their telephone bills. He provided a rental car because they couldn't afford one on their own. By the end of the scheme, they're living in a luxury house in the lakes here in Las Vegas, worth over a million dollars at the time. I think it was a million and a half was the purchase price, and who knows what now. Which, incidentally, she put in the name of her nephew, who's an officer in the Taiwanese Air Force, which gets us back down the road towards money laundering. But in addition to the house, from going from borrowing a car from Don Manzo, the records, the payments from these corporate funds are replete with payments to Jaguar leasing. They buy a Rolls Royce. I think when she was arrested, she was driving a late model Mercedes. That's where the money went. Yeah, they spent some of this on this refinery down in Searchlight that they had to do once the SEC started coming knocking, asking for the refinery. They didn't have any at that time, so they scrambled, put one together. After they wanted a consent injunction with the SEC, they have this refinery that they put hundreds of thousands of dollars into, and that's when they'd spin up and redouble their efforts to pump and dump the stock. What about the psychiatric testimony? In particular, it seemed to me quite inappropriate, actually, for the district court to place the amount of stress that it did on his assessment of what he thought of these actual experts because of their, although they have quite impressive resumes, because of their prior testimony for defendants in other cases. So if we thought that was inappropriate, what do we do next? I have several other arguments in addition to the credibility. Well, I understand that, but what I'm saying is that that appeared to be what the judge was relying on primarily. Is that not true, in refusing the new trial? That was prominent among, at least in what it is in oral analysis. What do we do with that if we're applying an abusive discretion standard and we think at least what he said most and most vigorously perhaps was an abusive discretion? I think what we do with it is we look at it and we apply the law. And the law is that this new evidence would have to have likelihood of changing the results of trial. Now, let's look at this new evidence. I'm not exactly sure what it is because, and I quote, and let me correct something. It's actually at page 60 of the sentencing hearing transcript. Appellant counsel, previously defense counsel, said she's not retarded. That just doesn't exist. The problem is the language barriers. And taking some kind of test in the English language, if they were done in Chinese or Taiwanese, she would do very well. But I think that's the problem in this particular case. That's what happened here. And that was one of my fundamental arguments with regard to psychological tests, that they weren't reliable. You're testing somebody from Taiwan based on an English language test with English language cultural references. So in terms of the reliability and misability of that evidence at a new trial, it wouldn't come in because counsel himself has conceded that those tests were flawed because of the English language. Now, was it a mystery to anybody that the defendant's original language was Mandarin? It wasn't. If you go back through the record of trial and the transcripts, that was one of the theories that was raised again and again by defense counsel pointing to the empty chair of Robert Flaherty, saying that this is a poor housewife, Taiwanese housewife, that isn't fluent in the English language. That was well-known. That was developed to the extent that it was without her testifying at trial. I guess my question is, what is the standard here or what is the appropriate way to proceed? Obviously, the district court judge was really weighing the evidence, deciding that it was not believable evidence, for a number of reasons. One was that he just didn't believe these people in general. Another was that he didn't, that he'd observed herself. Another reason was that the language issue. But still, all of these amount to weighing the evidence. Now, is that, without having held a hearing, is that a legitimate way to proceed with regard to new evidence? Yes, Your Honor. I believe it is under the established precedent of this circuit. And in our brief, we cite to the case of United States v. Mace, in which the court, and I read, appellates are incorrect in their assertion that the trial court should have held a hearing on their motion. The decision on whether to hold a hearing, as perceived by affidavit, is within the sound discretion of the trial court. In this case, the district court had affidavits and full reports from the psychologist and psychiatrist. While I was denied the opportunity to cross-examine them, which I would have welcomed and relished, he had affidavits saying this is how I would have testified. So, although he didn't hold a complete evidentiary hearing, he had all the information in front of him. And so I think he was well-equipped at that point in time. And he essentially decided that he wouldn't, that he himself, not the jury, but wouldn't believe it, and maybe even saying that he also said that he didn't think the jury would believe it. But he didn't say, what the one thing he didn't say, surprisingly enough, was that this wasn't really discovered evidence. He didn't say, he didn't really make it, he didn't say, did he, that there wasn't due diligence or whatever. Well, at the time, counsel were insisting that Ms. Flaherty was borderline mentally retarded. And in her, I don't know, it was 55 years or whatever, how long she had lived, nobody had ever made that suggestion before. And so I think that's what he was trying to say.  I don't think there's any evidence to support that trial. He had insider testimony of people. But anyway, am I right that that wasn't a reason he gave, the district court? I believe you're correct. At least that wasn't the gravelman of it. Well, he does say at the end, the defendant has failed to demonstrate the newly discovered evidence is reliable, could not have been discovered previously. So maybe that is a diligence issue. And would have resulted in acquittal. And I'm not sure of it. If you look at this again, what are we to do with it today? Well, what is this newly discovered evidence? Your position is that the district court looked at the evidence. Well, I'm not, I don't want to put words in your mouth. So if I'm wrong about this, say no. But is your position that district court looked at it, accepted all this evidence and said, even if all this evidence had come in and the jury had seen it and believed it wouldn't have made any difference in the verdict? Is that what the district court? In part, but I think it also went to the reliability of the evidence under Daubert. And he was finding that the evidence wouldn't have been admissible at trial in any case because he didn't feel that it was reliable. And I believe in light of counsel's concessions that she wasn't mentally retarded in any place near. Rather, this is a problem with using an English language and American-oriented test for a Mandarin-speaking native of Taiwan. I think that shows us or corroborates the fact that this would not be reliable and wouldn't be admissible at a new trial. Can the judge make a Daubert ruling without a Daubert hearing? I think in the context of a motion for a new trial, it was appropriate for him to look at this and decide whether or not the evidence indicates a new trial would probably result in an acquittal, which is one of the prongs that the appellant would have to show. And he found that they didn't show that, in part, because the evidence wasn't reliable. See, that's what I thought. I said, and you said, no, that's not quite right, that he looked at it. He said, if we put this before the jury, the jury would not have changed its mind. You came back and you said, but no, he was also saying some of the stuff, he would not have let the jury even hear, which led to my question, but can he make a Daubert exclusion ruling without having a Daubert hearing? Could he make that kind of determination about the reliability of the Daubert reliability determination without having a hearing? With having a hearing we had. A Daubert hearing. Yes, sir, because I believe that the district court had the full penalty of the evidence before him to be able to make that assessment. What's more, I think you're also correct that the district court did find, based upon the evidence of trial, because the evidence, again, the insider testimony and testimony from Mandarin speakers, Mandarin-speaking victims. Let me just recollect. It's been a long time since I've dealt with Daubert, but a Daubert hearing, you actually have to have people come in and say, this is the kind of evidence as to which you can have an expert opinion and they're basing it on scientific evidence and so on, and why we dispute this or that. But you actually have to have a hearing on that, right? Your Honor, the expert opinions and the basis for them was well-documented in the record. In fact, the reason the experts didn't appear wasn't at my insistence. Rather, it was the defense request, because the experts weren't available. So therefore, they proceeded with affidavits in lieu of the live testimony. The district court said, oh, go ahead. They weren't available because there wasn't a continuance or something like that? This had been continued several times previously, and at this point in time, the district court said, we'll hold a hearing. If in the course of the hearing I believe that I need more evidence, we'll have a full evidentiary hearing. And that was the context for what went on. But for example, you say it wasn't reliable. But one of the reports says that the test was a gesture for that. And it didn't place emphasis on her verbal abilities, and they were less culturally latent. So at least the people who did this, I mean, he discounted them because they were people who frequently testified for the defense, but they certainly had very fancy credentials, both of them. And so it's really troublesome that he just discounted them because essentially because they testified a lot for defendants in criminal trials. That's why he discounted them. He called them notorious. Yes, Your Honor. I believe that there are also alternate grounds, and that is in the brief that we filed at that point in time, I went through and looked at the various representations or misrepresentations the appellant had made. But this is why I started where I started, because we're applying an abuse of discretion standard, are we not? And ordinarily when you do that, you look at the grounds on which the judge exercises discretion. And if at least two of those grounds are highly questionable, one of them being these were notorious defense experts, despite their rather impressive credentials, and another one being that what they said was unreliable because of a language problem, even though they purported to take account of it and he didn't have a hearing, those are both reasons why we might say that he abused his discretion as to those two grounds. Then we see what's left. He did say something about it should have been discovered earlier, and he did say something about it wouldn't have affected the outcome, but I wasn't sure whether that wasn't just another way of saying because they wouldn't have been believed. Your Honor, I see my time is up, but I'll answer that question as best I can. If you look at the district court's holding, and I understand that he used dicta that I might not have used had I been in his place, but if you look at the holding, what it ultimately comes down to is he was finding that these psychological reports were not reliable and wouldn't have altered the verdict of trial. Now, in light of where we are at the moment. But the reason they couldn't be relied upon was given the history of these doctors and the inconsistency of their reports with the known conduct of the defendant, their opinions could not be relied upon. And I believe the second prong is crucial, because you look at the behavior that is demonstrated through the testimony of trial, both by insiders, by victims, and then later on in sentencing, letters that have been withheld were introduced in which people extol the defendant's wisdom and say they come to her advice and she's a civic leader and she's a philanthropist. When you put all that into a bundle, it becomes abundantly clear at this hour that the defendant's demonstrated behaviors do not comport with somebody of a borderline IQ, which the reported cases show should be working at McDonald's under strict supervision, not managing this corporate scheme. What's more, when you look at this item by item, they don't say that she was delusional. You can go through the various representations, and whether her IQ be 80 or 180, she knew that these representations are false. In fact, she says as much in stuff that was submitted to the district court at that point in time. Finally, Your Honor, in light of the concession that the reports were skewed and unreliable because of the English language problem, there would be no point in a new trial because the reports wouldn't be admissible. But on that, as I say, there was the reports accounted for that. So that seems to me to be contrary to the record. I don't believe that is the report said they accounted for, but if you actually go through the questions that she was being asked, for example, questions on Hamlet, the Sistine Chapel, things like that, that was included in the test. And there's no reason to expect somebody from Taiwan to have that sort of information. But what I'm relying on more is counsel, the appellant's own concession, that these – that she's not retarded. Thank you. You have about three minutes left. Well, Your Honor, what I would ask this court to do, or please the court, is to send us back for a hearing. On what? For these psychiatrists to testify and see whether or not the judge would believe what they have to say in live testimony. Well, you don't believe it. That's the real problem. No, that's not true. I do believe it. What I'm saying is she's not retarded. And I don't think they're saying she's really retarded. She has – they give her an IQ of a 79. That's not retarded. It's 70 and below. Okay. So she has an IQ of 79. Now the judge says it's right. Okay? So where are you now? I think it goes to her ability to understand and be able to work with the defense in presenting to the jury herself, I think. I think she should have testified so the jury could see what she's really like. That's an effective assistance of counsel. I understand. That's an issue later. We can't deal with that here now. If I could have, I would have. At page 11 of Dr. Feister's report, it says, Ms. Flaherty is far from bright, showing general mental functioning in the range between mental retardation and low average mental functioning. Now, you tell us very candidly, and we appreciate your candor today, that you've talked to her and she's not mentally retarded. We suspect that that's probably also what her trial counsel thought. Which is why nobody until some attorney between you and the trial counsel thought to get these witnesses. But you tell us she's not mentally retarded, and the doctor tells us that she is borderline retarded. That may be borderline. Why would we go back for a hearing? Well, I think if she were able to testify and have the psychiatrist testify as to what she's like, then have her get up there and the judge could see. But all this depends on having your client testify, doesn't it? Yes. And that bridge has already been crossed. I understand that. What you really have to do is get Dr. Feister up here, and Dr. Feister, however you pronounce her name, is going to testify that she's borderline mentally retarded. That's true. But then we would also put her on the stand on the motion for new trials so the court could see and back up what the doctor said. The court said it had observed her throughout the trial. Sitting at the table. And her interaction with her attorney. Yes. And a lot of testimony about how she's interacted with others. There is some, but mostly those that she interacted with were with the Chinese, with Chinese background from Taiwan. Feeling of her language. I still don't get it. OK. Yeah. Not everybody is a genius, right? Including me. No, I mean, you know, there's a certain level that we say that people are retarded. Maybe it's something that is relevant at trials or what to go to mental state or to go to. But she's not there. Why is the kind of evidence that, you know, and maybe this evidence, had you had it at a time of trial, would have been admissible. Maybe it would not have been. It's not absolutely clear to me that it would have been. But not everything that would have been admissible at a trial can be a basis for a new trial based on newly discovered evidence. Who she is and what she is and how she functions, of course, was known at trial. The only thing that wasn't known were these reports that some kind of lawyer or something gave. But even taking them at face value, why is the kind of evidence that even if we consider it newly discovered is sufficiently significant that we'd say, oh, we need a new trial for this? Because I think it then presents the picture, the mental state of the defendant to the jury. There's lots of stuff that rounds out the picture. There's lots of things that lawyers say, gosh, I wish I presented this to the jury. You know, I might have had a better result if I presented this or that. But most of that stuff is not. I mean, it's not like all of a sudden discovering, you know, you've got a photograph of her at a time of the crime and she's in the Sistine Chapel with the Pope. You know, that would be good. You know, that would be good. But it's not that kind of thing, right? No, it's not. I think that maybe would have an effect on the jury, and maybe the jury would look at it and say, oh, well. Isn't that exactly what the district judge did here? The district judge looked at it and said, I'm not impressed. I don't think this is on the level of even believing everything, taking everything at face value. I just don't think this is the kind of stuff that justifies a new crime. I think he went too far. He abuses discretion in not having the witnesses come in to testify, and then listening to the defendant. On the motion for a new trial. I don't understand how listening to the defendant on the motion for a new trial has anything to do with anything. The defendant put it, that's not newly discovered evidence. No, it is not. But the newly discovered evidence would be after hearing the doctors and then having her on the stand to see how she reacts to questions, to let the Court ask her questions. And clearly he would have seen the problems in this case. Clearly. Now, there's no doubt we have 2255. No doubt. I can't do that on a motion for an appeal. I've tried that before and been told otherwise. So clearly that's coming next unless you can give us at least a hearing, maybe a little void, the 2255. With that, I would submit unless you have any questions. Thank you. The case is now U.S. 10 submitted. We are adjourned.
judges: Hawkins, Berzon, Bybee